J-S08001-24
J-S08002-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| V.S.K. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| Y.V.K. | : | |
| | : | |
| Appellant | : | No. 1536 MDA 2023 |

Appeal from the Orders Entered October 30 2023
In the Court of Common Pleas of Cumberland County Civil Division at
No(s): 2016-03340

| | | |
|---|---|---|
| V.S.K. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| Y.V.K. | : | |
| | : | |
| Appellant | : | No. 1583 MDA 2023 |

Appeal from the Orders Entered November 7, 2023
In the Court of Common Pleas of Cumberland County Civil Division at
No(s): 2016-03340

| | | |
|---|---|---|
| IN THE INTEREST OF: M.K., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: Y.V.K., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1668 MDA 2023 |

Appeal from the Order Entered November 30, 2023
In the Court of Common Pleas of Cumberland County Juvenile
Division at No(s): CP-21-DP-0000153-2023

J-S08001-24
J-S08002-24

| | | |
|---|---|---|
| IN THE INTEREST OF: J.K., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: Y.V.K., MOTHER | : | |
| | : | |
| | : | No. 1669 MDA 2023 |

Appeal from the Order Entered November 30, 2023
In the Court of Common Pleas of Cumberland County Juvenile
Division at No(s): CP-21-DP-0000154-2023

BEFORE: OLSON, J., MURRAY, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY OLSON, J.: **FILED MAY 07, 2024**

In this consolidated appeal,[1] Appellant, Y.V.K., ("Mother") appeals *pro se* from two November 7 2023 orders entered in the Court of Common Pleas of Cumberland County that, *inter alia*, found Mother in contempt of a custody order, sentenced her to six months' incarceration with a purge

---

[*] Former Justice specially assigned to the Superior Court.

[1] In a December 28, 2023 *per curiam* order, this Court consolidated *sua sponte* Mother's appeals docketed with this Court at 1668 MDA 2023 and 1669 MDA 2023.

In a January 26, 2024 *per curiam* order, this Court, upon Mother's application for consolidation, consolidated Mother's appeals docketed with this Court at 1536 MDA 2023 and 1583 MDA 2023.

And, now, given the overlapping nature of the procedural posture of Mother's appeals, we *sua sponte* consolidate the four appeals for dispositional purposes. Due to the use of initials to identify the parties in the appeals filed at 1668 MDA 2023 and 1669 MDA 2023, and the sensitive nature of the matters herein, the captions for the appeals filed at 1536 MDA 2023 and 1583 MDA 2023 have been modified.

- 2 -

condition, and, as discussed in greater detail *infra*, denied her request to be released from incarceration during work hours.[2]  An appeal was also filed *pro se* from two October 30, 2023 orders entered in the Court of Common Pleas of Cumberland County that sentenced Mother to six months' incarceration with a purge condition,[3] declined to hold Mother in contempt of a final custody order, and dismissed Mother's request for a modification of a

---

[2] In her notice of appeal filed with this Court at 1583 MDA 2023, Mother purports to appeal from an October 27, 2023 order finding her in contempt and sentencing her to six month's incarceration, as well as a November 1, 2023 order denying her work release request.  The record reveals that the two orders were, in fact, filed by the trial court on November 6, 2023, and, pursuant to Pennsylvania Rule of Civil Procedure 236, notice was provided on November 7, 2023.  **See** Pa.R.Civ.P. 236(a) and (b) (requiring the prothonotary to immediately give notice to each party's attorney or, if unrepresented, to each party of, *inter alia*, a trial court order and to note on the docket the date notice was provided).  In determining the day of entry of an order, Pennsylvania Rule of Appellate Procedure 108 states that "the day of entry shall be the day the clerk of the court or the office of the government unit mails or delivers copies of the order to the parties, or if such delivery is not otherwise required by law, the day the clerk or office of the government unit makes such copies public."  Pa.R.A.P. 108(a)(1).  As such, the caption of the appeal filed with this Court at 1583 MDA 2023 has been corrected to reflect that Mother appeals from the November 7, 2023 order finding her in contempt and sentencing her to six months' incarceration and a separate November 7, 2023 order denying her work release request.  **See** Pa.R.A.P. 301(a)(1) (stating that, "[e]xcept as provided in subparagraph (2) of this paragraph [(relating to an appeal of a judgment of sentence in a criminal case)], no order of a court shall be appealable until it has been entered upon the appropriate docket in the trial court").

[3] We note that the Sentencing Code's prohibition against flat sentences (**see** 42 Pa.C.S.A. § 9756(b)(1) (stating, "[t]he [trial] court shall impose a minimum sentence of confinement which shall not exceed one-half of the maximum sentence imposed")) does not apply to indirect criminal contempt.  **See Commonwealth v. Marks**, 268 A.3d 457, 460-461 (Pa. Super. 2021).

final custody order.[4]  Finally, Mother appeals *pro se* from the November 30, 2023 orders entered in the Court of Common Pleas of Cumberland County that adjudicated M.K., a male child born December 2006, ("M.K.") and J.K., a female child born June 2008, ("J.K") (collectively, "the children") dependent pursuant to the Juvenile Act, 42 Pa.C.S.A. §§ 6301 – 6375.[5]  After careful review, we affirm the November 30, 2023 dependency orders as to M.K. and J.K.; affirm, in part, the November 7, 2023 order holding Mother in contempt of a final custody order in accordance with this memorandum; affirm the

---

[4] As discussed in greater detail *infra*, the appeal docketed with this Court at 1536 MDA 2023 was filed *pro se* by Mother's mother ("maternal grandmother").  The notice of appeal purports to appeal from an October 27, 2023 order sentencing Mother to six months' incarceration with a purge condition, but declining to hold her in contempt, and a second October 27, 2023 order dismissing Mother's petition for modification of the September 30, 2022 custody order.  The order sentencing Mother to six months' incarceration was dated, and filed by the trial court on, October 27, 2023, but the Rule 236 notice was not provided until October 30, 2023.  Similarly, the order dismissing Mother's petition for modification of the custody order was dated October 26, 2023, and filed by the trial court on October 27, 2023, but the Rule 236 notice was not provided until October 30, 2023.  As such, the caption of the appeal filed with this Court at 1536 MDA 2023 has been corrected to reflect that Mother appeals from the October 30, 2023 orders sentencing her to six months' incarceration and dismissing her petition for modification of the custody order.  ***See*** Pa.R.Civ.P. 236(a) and (b); ***see also*** Pa.R.A.P. 108(a)(1); Pa.R.A.P. 301(a)(1).

[5] On December 6, 2023, Mother filed *pro se* separate notices of appeal at trial court dockets CP-21-DP-0000153-2023 and CP-21-DP-0000154-2023 (the dependency cases).  Both appeals purported to challenge the trial court's dependency orders entered on November 17, 2023.  The record reveals that the trial court dated the dependency orders for November 17, 2023, but did not enter them on the docket until November 30, 2023.  As such, Mother's appeals properly lie from the dependency orders filed on November 30, 2023. ***See*** Pa.R.A.P. 301(a).

November 7, 2023 order denying Mother's work release request; and, dismiss the appeal docketed with this Court at 1536 MDA 2023.

A review of the record demonstrates a contentious and voluminous legal history. On June 13, 2016, Father, V.S.K., filed a custody action against Mother, pertaining to the aforementioned children, at trial court docket 2016-03340.[6] The trial court appointed counsel for Mother on February 16, 2017, but subsequently granted counsel's petition to withdraw on October 25, 2017. On October 27, 2017, Mother filed *pro se* her first appeal, challenging the trial court's order granting counsel's petition to withdraw. In a December 7, 2017 order, this Court quashed Mother's appeal on the ground that the October 25, 2017 order was not a final, appealable order. *Per Curiam* Order (1687 MDA 2017), 12/7/2017.

On April 24, 2018, the trial court entered a custody order that, *inter alia*, granted Mother and Father joint legal and physical custody of the children. Mother filed *pro se* an appeal of this custody order on April 25, 2018. This Court affirmed the April 24, 2018 custody order on October 11, 2018, and our Supreme Court denied Mother's petition for allowance of appeal. [**V.S.K.**] **v.** [**Y.V.K.**], 695 MDA 2018, 2018 WL 4927045, at *7 (Pa. Super. filed Oct. 11, 2018) (non-precedential decision) (stating, "Mother has waived all issues on appeal"), *appeal denied*, 198 A.3d 1053 (Pa. 2018).

_____

[6] The trial court granted Mother's and Father's divorce decree on May 10, 2019.

While Mother's appeal was pending before this Court, Father filed a petition for contempt on July 25, 2018, and a second petition for contempt on February 6, 2019.  On June 20, 2019, the trial court entered an interim order related to Father's contempt petitions, directing that the children's passports be renewed and then placed in the possession of the prothonotary for the Court of Common Pleas of Cumberland County.  On July 1, 2019, Mother appealed *pro se* the June 20, 2019 interim order.  In a September 4, 2019 *per curiam* order, this Court quashed Mother's appeal because the June 20, 2019 interim order was not a final, appealable order.  *Per Curiam* Order (1086 MDA 2019), 9/4/19.

Meanwhile, on July 22, 2019, the trial court entered an amended custody order that, *inter alia*, maintained the joint legal custody and shared physical custody of the children by Mother and Father.  On August 16, 2019, the trial court issued an order vacating the June 20, 2019 interim order and finding Mother in contempt.  Mother appealed *pro se* the finding of contempt on September 4, 2019, her fourth appeal.  On November 18, 2019, this Court dismissed Mother's appeal for failure to file a docketing statement as required by Pennsylvania Rule of Appellate Procedure 3517.  *Per Curiam* Order (1470 MDA 2019), 11/18/19; ***see also*** Pa.R.A.P. 3517 (stating, "Whenever a notice of appeal to [this Court] is filed, the Prothonotary [for this Court] shall send a docketing statement form which shall be completed and returned within ten [] days in order that [this] Court shall be able to more efficiently and expeditiously administer the scheduling of argument and submission of

cases on appeal. Failure to file a docketing statement may result in dismissal of the appeal.").

On December 29, 2020, Father filed a third petition for contempt. On March 17, 2021, the trial court found Mother in contempt, and on April 6, 2021, Mother appealed *pro se* the finding of contempt. On June 14, 2021, this Court quashed Mother's fifth appeal on the ground that the order "did not appear to impose sanctions" and, therefore, was not a final, appealable order of contempt. *Per Curiam* Order (448 MDA 2021), 6/14/21.

On August 18, 2021, Father filed an emergency petition for special relief, requesting, *inter alia*, that Mother forfeit the children's passports and that he be granted sole legal custody of the children, based upon his belief that Mother traveled internationally with the children. On August 20, 2021, the trial court directed Mother to forfeit the children's passports and issued a rule to show cause why Father's request for additional relief should not be granted. On August 30, 2021, the trial court referred the matter to custody conciliation and denied Father's request for additional relief but reminded Mother that she and Father shared legal custody of the children.

On September 30, 2021, Father filed a petition for contempt and a request to modify the July 2019 custody order. A hearing on Father's petition for contempt and modification of custody was held on January 19, 2022. On March 14, 2022, the trial court found Mother in contempt of the July 2019 custody order on the ground that she renewed, and retained, the children's passports and used the passports to travel internationally with the children in

August 2021. The trial court ordered Mother to pay a fine in the amount of $500.00, as well as reimburse Father for his legal fees and costs associated with his September 2021 contempt petition. In that same order, the trial court denied Father's request for sole legal custody of the children and denied Father's request to have the children vaccinated against the COVID-19 virus.

On April 1, 2022, Mother filed *pro se* a notice of appeal challenging the March 14, 2022 contempt order. On October 3, 2022, this Court reversed the portion of the March 14, 2022 order finding Mother in contempt and awarding sanctions but affirmed the portion of the order denying Father's request for sole legal custody. [**V.S.K.**] *v.* [**Y.V.K.**], 537 MDA 2022, 287 A.3d 830, 2022 WL 4683284, at *1 (Pa. Super. filed Oct. 3, 2022) (unpublished memorandum).

Meanwhile, on March 30, 2022, Father filed a fifth petition for contempt based upon Mother's refusal to release the children to Father for his period of weekly custody that was to commence on March 25, 2022. On April 14, 2022, Mother filed *pro se* a petition to modify custody. On July 7, 2022, the trial court entered an interim custody order granting sole legal and physical custody of the children to Father and granted Mother partial, supervised physical custody. On July 8, 2022, Father filed an emergency petition for the return of the children to his custody with the assistance of law enforcement. That same day, the trial court granted Father's petition, and the children were returned to Father's custody. On July 20, 2022, Father filed a petition for special relief pursuant to 23 Pa.C.S.A. § 5204 – actions for abduction

- 8 -

prevention measures on the ground that the children, upon being returned to Father's custody on July 8, 2022, absconded on July 10, 2022, and, as of July 20, 2022, had not been returned to his custody.[7] On July 21, 2022, the trial court, *inter alia*, ordered the return of the children to Father.

On September 30, 2022, the trial court entered a final custody order granting Father sole legal custody and primary physical custody of the children and granted Mother limited, supervised physical custody. Mother appealed the final custody order on October 4, 2022, and this Court affirmed the final custody order on March 8, 2023. [*V.S.K.*] *v.* [*Y.V.K.*], 1420 MDA 2022, 296 A.3d 587, 2023 WL 2397386, at *4-5 (Pa. Super. filed Mar. 8, 2023) (unpublished memorandum).

In the meantime, on October 14, 2022, Father filed a petition for special relief pursuant to Pennsylvania Rule of Civil Procedure 1915.13, requesting, *inter alia*, imprisonment or fines for Mother's non-compliance with the September 30, 2022 final custody order.[8] Additionally, on October 18, 2022,

---

[7] Section 5204 of the Domestic Relations Code states that "[a] party to a child custody determination . . . may file a petition seeking abduction prevention measures to protect the child under this chapter." 23 Pa.C.S.A. § 5204(b).

[8] Rule 1915.13 states,

> At any time after commencement of the action, the [trial] court may on application or its own motion grant appropriate interim or special relief. The relief may include, but is not limited to, the award of temporary legal or physical custody; the issuance of appropriate process directing that a child or a party or person having physical custody of a child be brought before the [trial]

Father filed a petition for contempt of the September 30, 2022 final custody order. On February 6, 2023, the trial court found Mother in contempt of the September 30, 2022 final custody order, and directed Mother to report for sentencing the following day.

The next day, February 7, 2023, the trial court ordered Mother to pay a $500.00 fine and sentenced Mother to six months' incarceration with a "special condition" that Mother "will be released when the children are returned to Father's custody and control." Trial Court Order, 2/7/23. On February 15, 2023, M.K., a subject child, filed *pro se* a petition for modification of the September 30, 2022 final custody order, requesting that Mother be released from incarceration and stating that M.K. did not want to live with Father. On February 17, 2023, Mother filed *pro se* a motion seeking release from incarceration for medical and employment reasons.

On February 22, 2023, Mother filed *pro se* an appeal of the February 6, 2023 order finding her in contempt of the final custody order. On October 3, 2023, this Court declined to quash Mother's appeal of the February 6, 2023 contempt order on the ground that the order was interlocutory. [**V.S.K.**] **v.** [**Y.V.K.**], 359 MDA 2023, 307 A.3d 632, 2023 WL 6443751, at *3 (Pa. Super. filed Oct. 3, 2023) (unpublished memorandum). Instead, this Court noted

court; and a direction that a person post security to appear with the child when directed by the [trial] court or to comply with any order of the [trial] court.

Pa.R.Civ.P. 1915.13.

that Mother filed her notice of appeal on February 22, 2023, after the trial court sentenced Mother for her contempt of the final custody order. *Id.* As such, this Court deemed Mother's appeal to lie from the February 7, 2023 sentencing order and, ultimately, affirmed the February 7, 2023 sentencing order. *Id.* at *1, *3.

While Mother's then-current appeal was pending before this Court, on March 3, 2023, the trial court denied the *pro se* petition for modification of the custody order filed by M.K. On March 21, 2023, the trial court ordered Mother's release from incarceration upon a finding that the children had been returned to Father's custody and control. On March 23, 2023, Mother appealed *pro se* the March 3, 2023 order denying M.K.'s petition for modification of custody. This Court dismissed Mother's appeal of the March 3, 2023 order on the ground that Mother "failed to pay the requisite filing fee for her notice of appeal." [***V.S.K.***] ***v.*** [***Y.V.K.***], 464 MDA 2023, 305 A.3d 997, 2023 WL 6121247, at *1 (Pa. Super. filed Sept. 19, 2023) (non-precedential decision).

Meanwhile, on April 13, 2023, Father filed a petition for contempt, asserting, *inter alia*, that Mother violated the September 30, 2022 final custody order. On May 2, 2023, Mother filed *pro se* a petition to modify custody, requesting "a reversal of custody [because] the children refuse to reside with [Father.]" Mother's Petition to Modify Custody, 5/2/23. On May 4, 2023, the trial court found Mother "in open, notorious, and willful violation of the September 30, 2022 [custody] order" because Mother exercised

- 11 -

physical custody of the children through proxy (*i.e.*, the children's maternal grandmother and aunt). Trial Court Order, 5/4/23. The trial court directed that Mother's sentencing hearing be held on May 16, 2023. *Id.*

On May 15, 2023, Mother filed *pro se* an appeal of the May 4, 2023 order. In a November 21, 2023 judgment order, this Court quashed Mother's appeal on the ground that the May 4, 2023 order was not a final, appealable order because, although it presented a finding of contempt, the order did not impose sanctions. [*V.S.K.*] *v.* [*Y.V.K.*], 712 MDA 2023, 2023 WL 8111470, at *1 (Pa. Super. filed Nov. 21, 2023) (unpublished memorandum).

In the interim, on May 16, 2023, the trial court sentenced Mother to six months' incarceration with a "special purge condition that the children be returned to the custody and control of Father for a period of [seven] consecutive overnights." Trial Court Order, 5/17/23. The trial court also ordered Mother to pay a $500.00 fine and Father's attorney's fees in the amount of $1,440.00. *Id.* On May 17, 2023, Mother filed a motion for work release, requesting that she be released from incarceration Monday through Friday during working hours.

On May 26, 2023, the children's maternal grandmother filed an affidavit stating that the children spent seven consecutive nights in Father's custody and control. That same day, Father filed an affidavit stating that the children spent consecutive nights in his custody and control but, *inter alia*, the children's personal belongings still remained at Mother's residence. The trial court ordered Mother's release on May 26, 2023, but stated that the "spirit"

of the special purge condition of the May 16, 2023 sentencing order had not been met and that if the children did not remain in Father's physical custody and control, Mother would be re-incarcerated. Trial Court Order, 5/26/23.

On August 11, 2023, Father filed a petition for contempt, asserting that Mother was in violation of the September 30, 2022 custody order, the May 16, 2023 sentencing order, and the May 26, 2023 release order because (1) Mother continued to have regular and routine contact with the children since the children reside with Mother; (2) Father has not had custody of the children since issuance of the May 26, 2023 release order; and (3) Mother failed to pay Father's attorney's fees in the amount of $1,440.00. On October 30, 2023, the trial court sentenced Mother to a term of six months' incarceration with the provision that Mother shall serve a period of incarceration continuously for at least two months after the children have been reunited with Father "to assure we don't have the children stay [with Father] for 12 hours and run home to [Mother's house] at that point."[9] Trial Court Order, 10/30/23. That same day, the trial court, in a separate order, dismissed Mother's petition to modify custody, filed on May 2, 2023, on the ground that the prerequisites for a petition seeking modification of custody, as directed by the September 30, 2022 custody order – namely that Father has primary custody of the children and that all other provisions of the September 30, 2022 custody order have

_____

[9] In its sentencing order, the trial court did not find Mother in contempt.

- 13 -

been complied with - have not been satisfied because Mother has not returned custody of the children to Father. Trial Court Order, 10/30/23.

On October 30, 2023, Mother filed a motion for release from incarceration during work hours, Monday through Friday. On November 6, 2023, an appeal was filed on Mother's behalf,[10] challenging the October 30, 2023 order sentencing Mother to six months' incarceration and the October 30, 2023 order dismissing her petition for modification of custody. A concise statement of errors complained of on appeal, pursuant to Pennsylvania Rule of Appellate Procedure 1925(b), was attached to the notice of appeal. This notice of appeal and concise statement were docketed with this Court at 1536 MDA 2023.

In the dependency cases (1668 MDA 2023 and 1669 MDA 2023), due to Mother's October 2023 incarceration and the children's refusal to reside in Father's care and control, the Cumberland Country Children and Youth Services ("CYS") filed applications for emergency protective custody of the children on October 30, 2023. In the applications, CYS averred the following:

1. On October 27, 2023, a custody hearing was held . . . regarding the children[, M.K. and J.K. The trial court] ordered the children to [Father's] custody after the hearing.

2. [Father] was going to attempt to pick the children up at school but was not confident that they would go with him. Father reported the children had run away.

_____

[10] As discussed in greater detail *infra*, the November 6, 2023 notice of appeal was filed on Mother's behalf by maternal grandmother.

3. Silver Spring Police Department [] picked the children up at or near [a business not far from the children's high school.]

4. [The solicitor for CYS and the director of CYS both] called [the trial court] to inform [the trial court] that [CYS] had beds available for the children at Bethany's Children's Home Shelter. [The trial court] was aware of the shelter.

5. [The trial court] placed the children in the legal and physical custody of [CYS] for placement in the Bethany's Children's Home Shelter.

6. [The trial court] authorized [the sheriff's] transport [of the children] to the shelter. [The trial court] denied [CYS's] request to keep the children's location from [Mother].

Application for Emergency Protection (M.K.), 10/30/23, at 3-4; ***see also*** Application for Emergency Protection (J.K.), 10/30/23, at 3-4. On November 1, 2023, CYS filed shelter care applications and petitions seeking dependency as to the children. Shelter Care Application (M.K.), 11/1/23; ***see also*** Shelter Care Application (J.K.), 11/1/23; Dependency Petition (M.K.), 11/1/23; Dependency Petition (J.K.), 11/1/23. Counsel was appointed to represent Mother in the dependency cases.[11]

_____

[11] In the dependency cases, on November 7, 2023 (order dated October 30, 2023), the trial court appointed Jennifer Archer, Esquire ("Attorney Archer") as guardian *ad litem* for the children. In separate orders, filed November 7, 2023, but dated October 30, 2023, the trial court appointed Joseph Hitchings, Esquire ("Attorney Hitchings") to represent Father, and appointed Robert H. Hawn, Jr., Esquire ("Attorney Hawn") to represent Mother.

After the appointment of Attorney Hawn, on November 7, 2023, Mother filed a counseled motion "to exercise [her] right of self-representation[,]" seeking permission to represent herself in the dependency cases. On November 22, 2023, the trial court, in an order dated November 17, 2023, granted Mother's request for self-representation but denied her request to proceed without

On November 8, 2023, the trial court issued orders, dated October 30, 2023, transferring legal and physical custody of the children to CYS and placing the children in the Bethany's Children's Home Shelter, effective October 27, 2023. Emergency Protective Custody Order (M.K.), 11/8/23; *see also* Emergency Protective Custody Order (J.K.), 11/8/23; Shelter Care Order (M.K.), 11/6/23; Shelter Care Order (J.K.), 11/6/23.

Meanwhile, in the contempt cases (1536 MDA 2023 and 1583 MDA 2023), the trial court, in a November 7, 2023 order, found Mother in contempt of the trial court's "previous orders" and directed, *inter alia*, that

Mother shall be incarcerated for a period of 6 months. Mother shall be freed or purged of this incarceration upon the children concluding 60 continuous days of living with Father[. I]n other words, upon Father exercising 60 continuous days of custody of the children, provided both Mother and the children are in compliance with all [] the treatment and all [] the other conditions including evaluations[,] the sentence may be purged. If the children do not reunite with Father, then the incarceration of [Mother] shall continue for the full 6 months as ordered.

Trial Court Order, 11/7/23, at ¶5 (paragraph formatting modified). In that same order, the trial court placed the children in "emergency protective custody" until they "begin living with Father as previously ordered[.]" *Id.* at ¶9. On November 7, 2023, in a separate order, the trial court denied Mother's request for work release. Trial Court Order, 11/7/23.

_____

standby counsel. Instead, the trial court appointed Attorney Hawn as standby counsel to assist Mother. Trial Court Order (M.K.), 11/22/23; *see also* Trial Court Order (J.K.), 11/22/23.

- 16 -

On November 13, 2023, Mother filed *pro se* a notice of appeal challenging the November 7, 2023 order finding her in contempt and, *inter alia*, sentencing her to six months' incarceration, as well as challenging the November 7, 2023 order denying Mother's motion for work release. Mother filed a concise statement of errors complained of on appeal, pursuant to Rule 1925(b), as part of her notice of appeal. This notice of appeal and concise statement were docketed by this Court at 1583 MDA 2023.

On November 17, 2023, Mother filed a motion seeking house arrest. On November 29, 2023,[12] the trial court filed an order, dated October 27, 2023, setting forth its findings of fact stemming from the October 27, 2023 contempt hearing, as follows:

1) [Mother] is found to have violated the [] September 30, 2022 [custody order] and is in contempt of court.

2) [Mother] avoided the truth, her testimony was dishonest, and her answers in particular were evasive of the questions.

3) [Mother] was more concerned with changing the subject than answering the questions.

4) [Mother] intentionally lied, especially that she does not live in the home with the children.

5) [Mother] uses her relatives to help hide her violations of the [custody order and] to disguise these blatant violations.

---

[12] We note that the findings of fact were filed by the trial court on November 28, 2023, but the Rule 236 notice was provided on November 29, 2023. Therefore, we refer to the trial court's findings of fact by the date of entry, that is November 29, 2023. *See* Pa.R.A.P. 108(a)(1).

6)   Mother[,] thus[,] has completely ignored the [custody order] which gives Mother supervised visitation.

7)   [Mother] violated the [custody order] with regard to [J.K. when the child was] transferred to cyber school because there is no authority for [Mother] to do this. Father had sole legal [custody] for the last year.

8)   Mother ignored and thumbed her nose at the [trial court] and the [custody order], which has happened often throughout the history of this case over the last [seven] years.

9)   [Mother] determined on her own against the interests of the children, and against the [custody order] that the [c]hildren shall not even see Father, who has sole legal and [primary] physical custody [pursuant to the] September 30, 2022 [custody order].

10)  [The] testimony shows that Mother lives "underground" with the children and with Mother's relatives, with curtains closed[,] suspiciously looking over her shoulder at people who might catch her in this contemptuous situation. This is not a normal situation due to her ignoring the law, and ignoring the rules in a civilized society.

11)  [Mother] contemptuously does not follow prior [trial court] rulings over and over again.

12)  [W]hen Mother[,] in the past[,] was incarcerated to motivate her to obey [a trial court order], she did just what was necessary to comply and get out of jail.

13)  Mother gave Father [seven] overnight [visits with the children] and then cut Father off [from having physical custody of the children] for the rest of the year.

14)  [Mother] lied to [trial court. T]he evidence from the private investigator [included] photo[graphs depicting Mother violating the custody order,] and [the private investigator's] testimony [demonstrated that the children were in Mother's] presence [] in violation of the [custody order].

15)  Mother, without Father's agreement or knowledge, applied [for] and[,] thus[,] contemptuously participated in and [solely] authorized application[s] for both of the children's work permits.

16)   [T]his is one of many examples of Mother's actions [showing disregard for trial court orders] or violat[ing the trial court orders].

17)   [Mother] applied for[,] and authorized an application for[,] a [learner's] permit [to allow M.K. to begin] driving, even though, again, Father had sole legal custody.

18)   [Mother] had in the past fraudulently endorsed Father's signature on the children's passports without Father['s knowledge or consent] when she [and Father] shared legal custody.

19)   [Mother solely] authorized the enrollment of both children in summer camp without the authority to do so.  Again, Father had sole legal custody and knew nothing of this occurrence.

20)   This case has endlessly proceeded since 2016, during which Mother faced contempt: [f]irst on August 13, 2018[; s]econd, one year later, on August 15, 2019, when Mother was found in contempt, and the [trial court] indicated in the order that "Mother refuses to release the children to Father's custody[;"] third on September 30, 2022[;] fourth in February 2023[; and] fifth in May [] 2023.

21)   The children are so entrenched against Father that the only person that can make a difference is Mother.  With a change in attitude and the right approach from her, [Mother] can create change in the children.

22)   In [setting forth its findings,] one year ago[, the trial court] stated that there were 189 docket entries at that time. Now, [twelve] months later, we have exactly 100 more docket entries.  So it is not 189, it is now 289, [docket entries,] which is an increase of fifty percent over the last year.  This case goes on and on and on without conformity to the [trial court's orders] by Mother.

Trial Court Order, 11/29/23.

On November 30, 2023, the trial court ordered Mother to pay Father's attorney's fees in the amount of $11,648.51.  Trial Court Order, 11/30/23.

That same day, November 30, 2023, the trial court, in the dependency cases (1668 MDA 2023 and 1669 MDA 2023), found the children, by clear and convincing evidence, to be dependent children on the ground the children "[are] without proper care or control, substance, education as required by law, or other care or control necessary for the [children's] physical, mental, or emotional health, or morals."[13]  Dependency Order (M.K.), 11/30/23; **see also** Dependency Order (J.K.), 11/30/23.  In the dependency decrees, the trial court further ordered that the legal and physical custody of the children remain with CYS, and the children were to be placed in the home of a KidsPeace Emergency Kinship Caregiver.  Dependency Order (M.K.), 11/30/23; **see also** Dependency Order (J.K.), 11/30/23.

On December 3, 2023, Mother filed *pro se* a motion for reconsideration of the November 7, 2023 order denying her request for work release.  The next day, December 4, 2023, Mother filed *pro se* a motion for reconsideration of the November 30, 2023 order awarding Father attorney's fees.

---

[13] We note that the dependency decrees are dated November 17, 2023, and were filed by the trial court on November 30, 2023.  The trial court docket reveals that Rule 236 notice was provided on November 30, 2023, to, *inter alia*, Attorney Hawn, who, as of November 22, 2023, was standby counsel for Mother.  It is unclear, however, whether Rule 236 notice was provided to Mother, who was acting *pro se* as of November 22, 2023.  Because timeliness of Mother's notices of appeal is not an issue in the case *sub judice*, we find that notice to Attorney Hawn is sufficient to satisfy Rule 236 and Rule 108(a)(1) under these circumstances.  As such, we find the dependency decrees as having been entered on November 30, 2023.

In the dependency cases (1668 MDA 2023 and 1669 MDA 2023), Mother filed *pro se* separate notices of appeal at each trial court docket (CP-21-DP-0000153-2023 and CP-21-DP-0000154-2023) on December 6, 2023. Mother filed a concise statement of errors complained of on appeal with each notice of appeal pursuant to Pennsylvania Rule of Appellate Procedure 1925(a)(2)(i).

On December 12, 2023, Mother filed a motion seeking an early release from incarceration due to a prison outbreak of the COVID-19 virus. On December 20, 2023, the trial court, *sua sponte*, modified the November 7, 2023 contempt and sentencing order by striking the language "[Mother] shall purge herself from contempt upon the children [] completing 60 continuous days of custody with [Father.]"[14] Trial Court Order, 12/20/23. In that same order, the trial court imposed "new conditions" that must be met for Mother to purge herself of contempt. *Id.* Those new conditions are as follows:

1. Each of the children and both parents shall be committed to enrolling in and participating in good faith in all required counseling sessions scheduled.

2. The [c]ounselor shall notify in writing the agency, the parties, and [the trial court] that the counseling is progressing. The counselor is [hereby] ordered released from any liability to issue such notification with or without the parties' written permission.

---

[14] The exact language of the November 7, 2023 order states, "Mother shall be freed or purged of this incarceration upon the children concluding 60 continuous days of living with Father[.]" Trial Court Order, 11/7/23, at ¶5.

> 3. Each party shall follow all terms and conditions as ordered in previous applicable custody orders including that [Mother] continue to have supervised visitation and [Father] sole [legal and primary physical] custody of the children.

*Id.* The trial court further ordered that Mother be furloughed from December 24, 2023, at 10:00 a.m., through December 25, 2023, at 6:00 p.m., to provide Mother with eight hours of supervised visitation with the children. *Id.*

On December 28, 2023, Mother filed *pro se* a motion seeking release from incarceration. The next day, December 29, 2023, Mother filed *pro se* a petition to modify custody. Then, on January 3, 2024, Mother filed *pro se* a second motion seeking release from incarceration. On January 4, 2024, the trial court denied Mother's motions for release from incarceration, as well as her petition for modification of custody. On January 16, 2023, Mother filed a third motion for release from incarceration, which the trial court denied on January 17, 2023.

In the contempt cases (1536 MDA 2023 and 1583 MDA 2023), Mother raises *pro se* the following issue for our review: "[W]hether the [trial court] abused its discretion in sending the family into incarceration to coerce [the] children to reside with [Father?]" Mother's Brief (1536 MDA 2023 and 1583 MDA 2023) at 10.

In the dependency cases(1668 MDA 2023 and 1669 MDA 2023), Mother raises *pro se* the following issue for our review: "[W]hether the [trial court] abused its discretion in finding that the children are dependent based on their

refusal to comply with a custody order to see [Father?]"  Mother's Brief (1668 MDA 2023 and 1669 MDA 2023) at 5.

**1536 MDA 2023 Appeal**

We begin by addressing the appeal filed on November 6, 2023 in the contempt matter and docketed with this Court at 1536 MDA 2023.[15]  A review of Mother's appellate brief filed jointly in the appeals docketed with this Court at 1536 MDA 2023 and 1583 MDA 2023, reveals an issue, and an argument in support thereof, challenging the November 7, 2023 order finding Mother in contempt of the custody order and sentencing her to six month's incarceration.  Mother's Brief (1536 MDA 2023 and 1583 MDA 2023) at 10.  Mother's brief does not advance an issue, or argument in support thereof, specifically challenging the October 30, 2023 orders that sentenced Mother to six months' incarceration with a purge condition, declined to hold Mother in

---

[15] We note that a review of the November 6, 2023 notice of appeal reveals that while the notice, as well as the proof of service and the attached concise statement contain Mother's typed name, none of these pages bear a signature above Mother's typed name or any other indication that Mother executed the documents.  The attached certificate of compliance statement does, however, contain maternal grandmother's signature above Mother's typed name along with a handwritten statement next to the signature line stating, "sign [*sic*] by her mother" and sets forth maternal grandmother's name.  ***See*** N.T., 11/17/23, at 16 (acknowledging that maternal grandmother filed the notice of appeal on Mother's behalf as Mother requested).

In light of our disposition of this appeal, we do not address whether the November 6, 2023 notice of appeal violates the prohibition against non-attorneys representing other parties before Pennsylvania courts.  ***See Barrett v. M&B Medical Billing, Inc.***, 291 A.3d 371, 376 (Pa. Super. 2022).

contempt of a final custody order, and dismissed Mother's request for a modification of a final custody order. Therefore, we dismiss the appeal docketed with this Court at 1536 MDA 2023. *See Kaur v. Singh*, 259 A.3d 505, 511 (Pa. Super. 2021) (stating, "[w]hen an appellant fails to properly raise and develop issues in briefs with arguments that are sufficiently developed for our review, [this Court] may dismiss the appeal"); *see also* Pa.R.A.P. 2101 (explaining that, if the defects in an appellate brief are substantial, the appeal may be dismissed).

### 1583 MDA 2023 Appeal

The crux of Mother's issue on appeal - "whether the [trial court] abused its discretion in sending the family into incarceration to coerce [the] children to reside with [Father]" – raises a challenge to the trial court's decision to sanction Mother for violating the September 30, 2022 final custody order that awarded Father sole legal custody and primary physical custody of the children and that allowed Mother to exercise only limited, supervised custody of the children. Mother's Brief (1536 MDA 2023 and 1583 MDA 2023) at 13-27.

In reviewing a trial court's finding of contempt and the sanctions imposed, "we are limited to determining whether the trial court committed a clear abuse of discretion[,] placing great reliance on the sound discretion of the trial [court.]" *P.H.D. v. R.R.D.*, 56 A.3d 702, 706 (Pa. Super. 2012).

Section 5323 of the Domestic Relations Code states, in pertinent part, as follows:

### § 5323.  Award of custody

. . .

**(g) Contempt for noncompliance with any custody order.** -

(1) A party who willfully fails to comply with any custody order may, as prescribed by general rule, be adjudged in contempt. Contempt shall be punishable by any one or more of the following:

(i) Imprisonment for a period of not more than six months.

(ii) A fine of not more than $500[.00].

(iii) Probation for a period of not more than six months.

(iv) An order for nonrenewal, suspension[,] or denial of operating privilege under section 4355 (relating to denial or suspension of licenses).

(v) Counsel fees and costs.

(2) An order committing an individual to jail under this section shall specify the condition which, when fulfilled, will result in the release of that individual.

23 Pa.C.S.A. § 5323(g).

It is well-established that "in reference to the civil contempt power[, t]he use of the power to enforce compliance is exercised with the objective of compelling performance and not inflicting punishment." ***Barrett v. Barrett***, 368 A.2d 616, 620 (Pa. 1977) (citation and original quotation marks omitted). "[A] court may not convert a coercive sentence into a punitive one by imposing conditions that the contemnor cannot perform and thereby purge himself[, or herself,] of the contempt." ***Id.*** at 620, 623 (stating, "the conditions imposed for purging [the contempt] must be within [the contemnor's] apparent power to perform"); ***see also Sinaiko v. Sinaiko***, 664 A.2d 1005, 1009-1010

(Pa. Super. 1995) (stating, "[a] court cannot impose a coercive sentence conditioned on the contemnor's performance of an act which is incapable of performance"); **Cunningham v. Cunningham**, 182 A.3d 464, 472 (Pa. Super. 2018) (stating, "the [trial] court, in imposing coercive imprisonment for civil contempt, should set conditions for purging the contempt and effecting release from imprisonment with which it is convinced beyond a reasonable doubt, from the totality of the evidence before it, the contemnor has the present ability to comply" (original brackets omitted; *citing* **Barrett**, *supra*)).

To begin, we must first determine the exact purge conditions that were imposed upon Mother as a condition of her release. As discussed *supra*, on November 7, 2023, the trial court incarcerated Mother for a period of six months for her contempt of the September 30, 2022 custody order and imposed the following purge condition:

> Mother shall be freed or purged of this incarceration upon the children concluding 60 continuous days of living with Father[. I]n other words, upon Father exercising 60 continuous days of custody of the children, provided both Mother and the children are in compliance with all [] the treatment and all [] the other conditions including evaluations[,] the sentence may be purged. If the children do not reunite with Father, then the incarceration of [Mother] shall continue for the full 6 months as ordered.

Trial Court Order, 11/7/23. Mother subsequently appealed this order on November 13, 2023. On December 20, 2023, the trial court modified its November 7, 2023 order by striking the original purge condition and implementing a new purge condition, as follows:

- 26 -

1.      Each of the children and both parents shall be committed to enrolling in and participating in good faith in all required counseling sessions scheduled.

2.      The [c]ounselor shall notify in writing the agency, the parties, and [the trial court] that the counseling is progressing. The counselor is [hereby] ordered released from any liability to issue such notification with or without the parties' written permission.

3.      Each party shall follow all terms and conditions as ordered in previous applicable custody orders including that [Mother] continue to have supervised visitation and [Father] sole [legal and primary physical] custody of the children.

Trial Court Order, 12/20/23.

Section 5505 of the Judicial Code states that "a court upon notice to the parties may modify or rescind any order within 30 days after its entry, notwithstanding the prior termination of any term of court, if no appeal from such order has been taken or allowed." 42 Pa.C.S.A. § 5505. Thus, Section 5505 permits a trial court to modify an order within 30 days of entry so long as no appeal has been taken.

In the case *sub judice*, the trial court's December 20, 2023 order modifying the purge conditions was entered **after** Mother appealed the November 7, 2023 order setting forth the original purge conditions. Moreover, the December 20, 2023 order was entered more than 30 days after the November 7, 2023 order. Therefore, the trial court was not permitted to modify the purge conditions, and we vacate that portion of the December 20,

2023 order setting forth the "new conditions" for purge.[16]  ***See*** 42 Pa.C.S.A.

§ 5505; ***see also*** Pa.R.A.P. 1701(a) and (b) (stating that, after an appeal has

been taken, the trial court may no longer proceed in the matter except to,

*inter alia*, preserve the *status quo* or correct formal errors in the record).

Consequently, our review involves an examination of the sanctions and purge

conditions originally imposed upon Mother in the contempt order entered on

November 7, 2023.

The essence of Mother's argument is that she remains incarcerated

"because two teenaged children decided not to reside with [Father] contrary

to [the custody order] directing them to do so."  Mother's Brief

(1536 MDA 2023 and 1583 MDA 2023) at 14.  Mother further asserts that

> [the trial c]ourt fashioned a remedy to reunite the children with
> [Father] by conditioning the contempt purge on the children
> spending sixty days with [Father.]  This condition was outside the
> ability of [Mother, who was incarcerated,] to have any control
> over.

***Id.*** at 21.  Mother argues that "[i]ncarceration is not a means to remedy

parental alienation in the guise of a contempt sanction."  ***Id.*** at 24.  Mother

further contends that the trial court went "well beyond its statutory authority

contained in [Section] 5323[(g)]" by (1) ordering that Mother undergo a

mental health evaluation and follow any recommended treatment plan, (2)

_____

[16] In the December 20, 2023 order, the trial court also furloughed Mother's
incarceration for a period of 32 hours in observance of the Christmas holiday.
We decline to address the Christmas furlough as the passage of time has
mooted this provision.

ordering that the children be evaluated and participate in a recommended treatment plan, and (3) ordering Mother to participate in reunification counseling to learn how to avoid parental alienation. *Id.* at 16-18.

Section 5323(g) clearly sets forth the sanctions that may be imposed upon a finding of contempt of a custody order. Those sanctions include, *inter alia*, imprisonment, imposition of a fine, probation, and compulsory payment of attorney's fees. 23 Pa.C.S.A. § 5323(g). Absent from this list of permissible sanctions is the ability of a trial court to order mental health evaluations or counseling services and to direct a parent (or child) to participate in a recommended treatment plan addressing lifestyle changes identified during an evaluation or counseling session. As such, we are constrained to vacate paragraphs 2, 3, and 4 of the trial court's November 7, 2023 order as these paragraphs were imposed without authority pursuant to Section 5323(g).[17]

Thus, we are left with determining whether or not paragraph 5 of the November 7, 2023 order imposed a coercive purge condition or a punitive purge condition that Mother was unable to achieve. Upon review, we find

_____

[17] We leave undisturbed paragraphs 6 through 11 of the November 7, 2023 order because these paragraphs relate to the dependency actions involving the children and do not involve sanctions imposed as a result of Mother being found in contempt of the September 30, 2022 custody order. *See* Trial Court Order, 11/7/23, at ¶¶6-11. Furthermore, we leave undisturbed paragraph 1 of the November 7, 2023 order that sets forth the trial court's finding of Mother in contempt of the September 30, 2022 custody order, as Mother does not challenge this finding and the trial court's finding is supported by the record.

Mother's interpretation of the purge condition – that the trial court wrongly conditioned Mother's release from incarceration upon the children residing with Father – to be misplaced. In discussing the purge condition, the trial court stated that "[i]f Mother attempted but failed to motivate and discipline the children so that they will follow the [terms of the custody order, the trial c]ourt would certainly not keep [Mother] in prison." Trial Court Opinion, 1/11/24, at 13. The trial court further explained its expectation that "[i]f the children have no contact whatsoever with Father then Mother should be instilling in the children that there are consequences for actions taken or not taken." *Id.* at 8. Thus, the trial court's intent behind the purge condition imposed upon Mother was to motivate Mother to encourage the children to comply with the custody order and reside with Father. As the trial court noted, and the record supports, "[t]he children are so entrenched against Father that the only person that can make a difference is Mother. With a change in attitude and the right approach from her, it can create change in the children." Trial Court Findings of Fact, 11/29/23. As such, we concur with the trial court that the purge conditions were completely within Mother's control (*i.e.*, to motivate and discipline the children by instilling in them the need to comply with the custody order) and, therefore, are not punitive in nature. It is up to Mother to decide whether she will stop encouraging the children to "live underground," with the curtains drawn, suspiciously looking over their shoulders and, instead, motivate them to reside with Father as the parent with primary physical custody. Therefore, we discern no abuse in the trial court's

- 30 -

imposition of sanctions with the purge condition as set forth in the November 7, 2023 order upon its finding Mother in contempt of the custody order.[18]

**1668 MDA 2023 & 1669 MDA 2023 Appeals**

In her appeals filed with this Court at 1668 MDA 2023 and 1669 MDA 2023, Mother, as set forth in her second issue *supra*, challenges the trial court's November 30, 2023 dependency orders, finding both children to be dependent. Mother's Brief (1668 MDA 2023 and 1669 MDA 2023) at 5.

It is well-established that

> the standard of review in dependency cases requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record, but does not require the appellate court to accept the [trial] court's inferences or conclusions of law. Accordingly, we review for an abuse of discretion.

*In re R.J.T.*, 9 A.3d 1179, 1190 (Pa. 2010).

---

[18] Although Mother purports to appeal the November 7, 2023 order denying her request for work release, the "statement of the question presented" included in Mother' appellate brief to this Court omitted a challenge to the work release order. **See** Mother's Brief (1536 MDA 2023 and 1583 MDA 2023) at 10. Therefore, Mother waives her challenge of the November 7, 2023 work release order. **See Krebs v. United Refining Co. of Pennsylvania**, 893 A.2d 776, 797 (Pa. Super. 2006) (stating, any issue not set forth in, or suggested by, the statement of questions involved is waived).

Moreover, assuming *arguendo* that Mother's challenge to the work release order has not been waived, we concur with the trial court, and the record supports, that Mother failed to demonstrate that she is currently employed. Therefore, the trial court did not abuse its discretion in denying Mother's request for work release.

Section 6302 of the Juvenile Act defines a "dependent child," in pertinent part as:

A child who[] is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his[, or her,] physical, mental, or emotional health, or morals. A determination that there is a lack of proper parental care or control may be based upon evidence of conduct by the parent, guardian[,] or other custodian that places the health, safety[,] or welfare of the child at risk, including evidence of the parent's, guardian's[,] or other custodian's use of alcohol or a controlled substance that places the health, safety[,] or welfare of the child at risk[.]

42 Pa.C.S.A. § 6302. Sections 6341(a) and (c) of the Juvenile Act empower a trial court to adjudicate a child dependent if the child meets the statutory definition of a dependent child, as defined by Section 6302, by clear and convincing evidence. *See* 42 Pa.C.S.A. § 6341(a) (stating, "[a]fter hearing the evidence on the petition[,] the [trial] court shall make and file its findings as to whether the child is a dependent child"); *see also* 42 Pa.C.S.A. § 6341(c) (stating, "[i]f the [trial] court finds from clear and convincing evidence that the child is dependent, the [trial] court shall proceed immediately or at a postponed hearing, which shall occur not later than 20 days after adjudication if the child has been removed from his home, to make a proper disposition of the case"); *In re E.B.*, 898 A.2d 1108, 1112 (Pa. Super. 2006) (stating, "[a trial] court is empowered by 42 Pa.C.S.A. § 6341(a) and (c) to make a finding that a child is dependent if the child meets the statutory definition by clear and convincing evidence").

If the [trial] court finds that the child is dependent, then the [trial] court may make an appropriate disposition of the child to protect the child's physical, mental[,] and moral welfare, including allowing the child to remain with the parents subject to supervision, transferring temporary legal custody to a relative or a private or public agency, or transferring custody to the juvenile court of another state.

*E.B.*, 898 A.2d at 1112, *citing* 42 Pa.C.S.A. § 6341(a).

In the case *sub judice*, Mother, in challenging the trial court's dependency orders, argues that "the [trial] court [misused] the dependency proceeding to **create a disaster** by acquiring jurisdiction over the children to **force** them into residing with [Father, with the trial court] not knowing anything about [Father], and keeping [Mother] and the children incarcerated while the process takes **baby-steps.**" Mother's Brief (1668 MDA 2023 and 1669 MDA 2023) at 39 (emphasis in original). Mother asserts that this case presents "an excellent opportunity [for this Court] to finally put its foot down on an abuse of discretion that misuses government resources to create **disasters** involving **sickos** [(referring to the guardian *ad litem*)] who **force** children into family relationships by depriving them of other family relationships and their homes." *Id.* at 40 (emphasis in original). Mother contends that "[d]ependency proceedings are not established by statute to **force** children into residing with a parent with whom they do not want to reside." *Id.* at 24 (emphasis in original). Mother avers that "the children feel [Father] is *persona non grata*, [and Mother] is ready, willing, and able to provide adequate care for the children [and, therefore, the trial court] cannot find the children dependent on the basis of lacking proper parental care and

control." *Id.* at 31-32. Mother argues that the trial court "simply locked [Mother] up[,] making her unavailable [to care for the children] and that is an abuse of discretion." *Id.* at 32. Mother further asserts that the trial court abused its discretion by failing to make findings of fact and to specify the basis for its dependency findings under the Juvenile Act. *Id.* at 27, 30. Rather, Mother contends that the trial court "had its mind made up *a priori*[] that [Mother] was the culprit, the children were deluded, [and Father] was the victim, and [trial court was] dictating its goal as to what actions everyone must take, or else." *Id.* at 33.

In its petitions for dependency, CYS asserted that the children were "without proper parental care or control, subsistence, education as required by law, or other care or control necessary for [their] physical, mental, or emotional health, or morals." Dependency Petition (M.K.), 11/1/23; *see also* Dependency Petition (J.K.), 11/1/23. In the petitions, CYS asserted the following facts in support of a finding of dependency as to each of the children:

1. On July 13, 2022, [CYS] received a general protective service [("GPS") referral] for concerns of parental alienation of the children, [M.K. and J.K.,] from [Father]. The referral alleged that the children ran from [Father's] home and went to [the] home [of Mother] and [their maternal grandparents.]

2. The referral further alleged that while the children were in [Mother's] care, the children missed counseling appointments, and [J.K.'s] school performance suffered necessitating summer school. The children were being manipulated into dangerous decisions, such as running away from [Father's] home in the middle of the night. The referral was closed on September 13, 2022.

3.      On February 21, 2023, [CYS] received a GPS referral for concerns about the impact of the ongoing custody matter on the safety and well[-]being of the children. The referral alleged that the children had run away again from [Father's] home in the middle of the night after [Mother] was incarcerated for contempt of a custody order. The children were residing alone in [Mother's house] without a caregiver.

4.      While the concerns for the children refusing to reside with [Father] were found to be true, [CYS] could not substantiate concerns that the children were residing alone in [Mother's house.] The children were interviewed concerning their fear of [Father]; however, the children did not disclose abuse or neglect that warranted [CYS] intervention or present a risk of harm. The referral was closed on March 14, 2023.

5.      On October 27, 2023, a custody hearing was held [] concerning the children. During the hearing, [Mother] was taken into custody and ordered to remain incarcerated for up to six months due to violating a custody order. [The trial court] ordered the children to remain in the legal and physical custody of [Father] or they would be placed in [CYS's] legal and physical custody.

6.      [Father] stated that he [went] to [the high school] where the children attend school [] to see if he could convince [the children] to come home with him. When [Father] arrived at [the high school], the children were gone. Silver Spring Police Department [discovered] the children at [a local business nearby.] The children refused to reside with [Father.]

7.      On October 27, 2023, [CYS] contacted [the trial court] to inform [the trial court] that the children would not return to [Father's] home.

8.      [CYS] obtained a verbal order [from the trial court] placing [the children] in the legal and physical custody of [CYS] for placement at Bethany Children's Home Shelter.

Dependency Petition (M.K.), 11/1/23, at 1-2 (extraneous capitalization omitted); *see also* Dependency Petition (J.K.), 11/1/23, at 1-2 (extraneous capitalization omitted).

On November 17, 2023, the trial court conducted a hearing pertaining to CYS's dependency petitions. CYS was represented by Lindsay Baird, Esquire ("Attorney Baird"). Attorney Hitchings represented Father. Mother represented herself *pro se*, with the assistance of standby counsel, Attorney Hawn. Attorney Archer was appointed as guardian *ad litem* and represented the legal and best interests of the children. The aforementioned counsel, as well as Mother acting as her own legal representative, participated in the hearing. Father, Mother, M.K., J.K., and the prospective caregiver for the children also attended the hearing.

On November 30, 2023, the trial court found that CYS met its burden under the Juvenile Act and subsequently adjudicated the children dependent. In so finding, the trial court continued legal and physical custody of the children by CYS and placed the children with the caregiver, thus removing the children from placement in the Bethany Children's Home Shelter. In explaining its finding of dependency and placement of the children with the caregiver, the trial court stated

> The direction that [the trial court] has stated, the way the judicial winds are blowing, so to speak, is that we could go toward counseling. I mean, the situation as it now exists is not really progressing. It's not. It is what it is, and it'll remain what it is. And I don't know that we can - and it's the best we can do because it's the only thing we can do. And I'm talking about the children in placement and [Mother] in prison. And that is what's got to be.

> But I'm confident, as has been echoed by some and I hope by all[ - ]that we get a neutral counselor, one that's agreeable to everyone. And that's going to probably be a difficulty right there. And that we get everyone to participate in that.

Which brings me to, do we hold that over the head[s] of everyone and [not] make any changes right now in the placement until we can have that all worked out and have agreement as to who the [counselor] would be, [] commitment by the children to participate, [and commitment] by [Father] to participate [in counseling]? Or do we go ahead with what is recommended at this point, which is very, very important, and that is local placement, least restrictive, to [the prospective caregiver]? But then, as pointed out, we would have to have the commitment from the children that they will participate [in counseling].

As [Father] pointed out, we don't know if that'll happen. I don't know if that'll happen. When I talked to both [children], and I think I have somewhat of a commitment from one, but I don't know that I have a commitment from the other.[19] And that's what we need. And I haven't even spoken with [Father] as to whether or not he would participate. But I believe the immediate goal is to have reunification with [Father]. And there's a lot of healing that needs to be done. There's a lot of hurt on both sides. And we don't - individually, we're not able to identify all those things, especially on the other side.

But those things do exist. They certainly exist. And they need to be communicated through a neutral counselor and communicated in a positive way to the other party.

. . .

We have to have a commitment. We have to have some give and take. We have to have the children go a little bit. I mean, [] like I said to [the children] in [chambers], it would be great to get [the children] to go 50 percent. Again, I haven't talked to [Father.] So I don't know - to get [Father] to go 50 percent, that would be great. But if we can get [Father] to go a few percentage points at a time, talk about some of these issues. Because there's a long history of hurt. There's no question about that, there's a long

_____

[19] When the trial court asked the children about whether, or not, they would be willing to participate in counseling with Father, M.K. responded that he was willing to consider counseling. N.T., 11/17/23, at 57. J.K., on the other hand, responded that she would not consider counseling "right now" because she was trying to "focus on school again." *Id.* at 64-65.

history of hurt. Whether it's justified, whether it's right as far as the children are concerned, as far as [Father] is concerned.

In other words, did the children believe that [Father] is correct with his hurt or does [Father] think that the children are correct with their hurt. And I'm not even getting [Mother] into this at all. I mean, I don't know where we'd be with that. But right now we're just talking about [Father] and the [children] getting together, working to get together because that's the best thing. All I want to do is what is right. That's all I've ever wanted to do[.] And it's what I want to do in this case, that is what I believe is right.

To add to that, that's what has been ordered previously[ - ]consistently by [the trial court]. And to add to that, there has been a finding by [the trial court] of contempt for [Mother] not complying [with the custody order]. And that's all going in the wrong direction. Just like where we are now is going in the wrong direction, [Mother] in jail and the [children] in placement. That's the absolute wrong direction. It's almost like we have to hit bottom in order for there to be something positive that happens and hit bottom like an addicted individual, someone who really suffers, hit bottom so that they'll finally change what they're doing. And by change we can have something positive happen.

So I want to make it clear that we're going to continue the goal. We will continue the placement. I will make the transfer to [the prospective caregiver] effective [November 17, 2023]. But I have to have the compliance by the children, the commitment by the children, that they will do what they need to do in order for reunification to take place. Those are the things that have to happen.

N.T., 11/17/23, at 98-99, 101-102.

Upon review, we concur with the trial court, and the record supports, that CYS demonstrated, by clear and convincing evidence, that the children were without parental care or control, subsistence, education, or other care or control necessary for their physical, mental, or emotional health, or morals. At the outset, pursuant to the September 30, 2022 custody order, Father had

sole legal and primary physical custody of the children. It is uncontested that as of October 27, 2023, Mother was incarcerated and, therefore, was unable to provide the children with the necessary parental support to avoid a finding of dependency. Moreover, because Mother had only limited, supervised physical custody of the children pursuant to the September 30, 2022 custody order, Mother did not present an option for providing the necessary parental support to avoid a finding of dependency because the children, pursuant to the custody order, were not permitted to live permanently, or even temporarily, with Mother.

As for Father, the trial court heard statements from both children that they did not wish to live with Father, at this time.[20] M.K. agreed that a child, such as himself, should have both a mother and a father and that it was his desire "to have a strong relationship with both" his Mother and Father. *Id.* at 44. M.K. told the trial court, however, that Father was "purposefully neglecting" and "avoid[ed] a relationship with [him] and instead has been going to court and forcing [J.K. and him to reside with Father.]" *Id.* M.K.

---

[20] The trial court's discussions with the children occurred in chambers with Attorney Archer, the guardian *ad litem*, present. ***See generally,*** N.T., 11/17/23, at 42-72; ***see also Interest of J.F.***, 308 A.3d 1252, 1260 (Pa. Super. 2024) (stating, a child "has a clear, statutory entitlement to counsel at 'all stages' of the dependency proceedings"). None of the parties in the case *sub judice* raised concern over the trial court's appointment of a guardian *ad litem* to represent the children's best interests and legal interests, and we decline to raise this issue *sua sponte*. *Id.* at 1261 n.8 (stating, an appellate court is not authorized to review *sua sponte* whether a child's appointed counsel has a conflict of interest in representing both the child's legal interest and best interests).

stated that "I don't' think I should have to beg for food and water and clothing and shelter from my own dad who's worked hard to put my mom in jail, and worked hard to get custody of us just for him to not want to support us." ***Id.*** at 45-46.  M.K. explained that he didn't want to spend time with Father "because I've given him so many chances to fix his – our relationship together, but he just keeps hurting it and hurting it." ***Id.*** at 46.  M.K. further stated "I think the whole court thing[ - ] he shouldn't have started in the first place.  He could just speak to me and [Mother] normally on a normal level.  Not force us [(M.K. and J.K.)] with him and then put [Mother] in jail." ***Id.*** at 54.  When asked if he were willing, at this point, to "spend some time with [Father,]" M.K. stated "not [anymore]." ***Id.*** at 55.  M.K. went on to explain,

> I would spend time [with Father,] and then also live with him like a normal family with a father and also with a mother.  But I think he's done too much to hurt the relationship.  Unless he makes an effort first, or just at least something.  Because he was the one who destroyed the relationship to begin with.  And I've done everything I can to fix it.  I've been reaching out.  I've been asking.  I've been, you know, wanting support from him.  But he would not [give support.]

***Id.*** at 56.  Ultimately, M.K. did agree that he was willing to consider counseling to help rebuild his relationship with Father.  ***Id.*** at 57.  M.K. further stated that, in the meantime, he preferred to live with the prospective caregiver if he could not live with Mother because he could return to his high school.  ***Id.*** at 57-59 (stating, "I [(M.K.)] think it would be a waste for me to spend the rest of my childhood in a shelter").

J.K. similarly told the trial court that she did not wish to live with Father, stating that she did not want to live in a house with someone she did not feel safe with. *Id.* at 62. J.K. described Father as being impatient and getting upset over "small things." *Id.* at 61. J.K. further stated that "while my parents were still together and we all lived in the house, [Father] used to hit me and [M.K.] and [Mother, and] he would hit [Mother] in front of us."[21] *Id.* at 62. J.K. explained that she had concerns about participating in counseling to reunite with Father because the prior counselor would repeat things that she told the counselor about Father's abusive actions and "on the car ride home [Father] was screaming at us like, why would you say I hit you[?] I never hit you." *Id.* at 66. J.K. stated that Father acts "nicer" in public then he does in front of the children. *Id.* at 67. Ultimately, J.K. stated that she would consider participating in counseling again provided that it did not interfere with her maintaining her "good grades" in school. *Id.* at 68. Finally, J.K. stated that she was familiar with the proposed caregiver because she was friends with the prospective caregiver's daughter before the daughter left for college, and she knew the prospective caregiver through church. *Id.* at 70-72.

When asked if she was opposed to the children and Father undergoing counseling "to strengthen their relationship," Mother responded, "of course not. I'm all for it." *Id.* at 85. Mother also stated that she supported the

_____

[21] Attorney Archer confirmed that during her conversations with the children as guardian *ad litem*, both J.K. and M.K. shared similar stories involving Father's abusive actions. N.T., 11/17/23, at 63.

children's placement with the prospective caregiver so the children would hopefully be able to return to "some sense of normalcy" by returning to their high school. *Id.* at 87. Mother further stated that she was willing to do what she could "to ensure that the children, if found dependent, are eventually returned, to be reunited with [her] and [Father] as soon as possible." *Id.* at 89.

Father testified that he "had no particular issues" with the proposed caregiver except for a concern that "as soon as the children are in [the caregiver's custody], the maternal relatives will start attempting to communicate with the children." *Id.* at 92. Father stated that he was absolutely willing to participate in counseling with the children. *Id.* at 94.

Finally, Attorney Archer, as guardian *ad litem*, presented the position, on half of the children, as follows:

> I've spent enough time with the children to know that they are bright, very capable, young people. . . . And I do believe that they both understand the importance of [having] a mother and father [in their lives]. I also believe Your Honor was correct when you came to the bench after the break and said that a counselor, in the middle of all of this to try to put the pieces together into some kind of working functioning unit, is what is necessary. I make no judgments on what that will look like in the end.
>
> I believe both children are willing to engage in therapy. I believe it does take effort and a lot of trust for them to do that. I think the identification of the [counselor] is very important to them. I did share with [CYS] at least one very neutral [counselor] that I've had experience with in the past[.] I think the parties can agree to somebody certainly outside of court. And ultimately, I agree with [CYS's] recommendation that the placement be moved to the least restrictive environment as required by the law.

> And again, I think we need to support the children in their education in being in a least restrictive environment, and hearing what their needs are and meeting them where they are with the [counselor] is the best way to go.

*Id.* at 96.

Upon review, we discern no abuse of discretion in, and the record supports, the trial court's orders finding the children to be dependent and placing the children with the caregiver. Mother was unable, due to her incarceration, and the restrictions placed upon her by the September 30, 2022 custody order, to provide parental care or control, subsistence, education as required by law, or other care or control necessary for the children's physical, mental, or emotional health, or morals. Moreover, the children have historically refused to stay with Father, and both Mother and Father, as demonstrated by their testimony at the dependency hearing, supported the placement of the children. Our hope is that during the pendency of these appeals, that Mother, Father, and the children have engaged in the counseling, as directed by the trial court, and that all parties have found family harmony during the children's soon to be gone adolescent years.

**Conclusion**

November 7, 2023 contempt order affirmed, in part, and vacated in part. November 7, 2023 contempt order is affirmed insofar as it holds Mother in contempt of the September 30, 2022 final custody order and denies her request for work release. Paragraphs 2, 3, and 4 of the November 7, 2023 contempt order, however, are vacated as they purport to order mental health

and counseling services for Mother and the children as a sanction for contempt in violation of 23 Pa.C.S.A. § 5323(g). November 30, 2023 dependency orders affirmed. Appeal docketed at 1536 MDA 2023 dismissed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 05/07/2024